(80 Misc. Rep. 173.)

TOWN OF SMITHTOWN v. ST. JAMES OYSTER CO. et al.

(Supreme Court, Special Term, Suffolk County.   March 31, 1913.)

1. FISH (§ 7*)—OYSTER BEDS—INJUNCTION.
    Rights in oyster beds are a subject for protection by injunction against depredations thereon, irrespective of defendants' responsibility.
    [Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 9, 10, 15; Dec. Dig. § 7.*]

2. FISH (§ 7*)—ADVERSE POSSESSION—OYSTER BEDS.
    Long, continuous, exclusive, open, notorious, and peaceable possession by a town, for the benefit of its inhabitants, of oyster beds in a bay, gives it, if not a title by prescription, the benefit of any presumption which may be used to supply defects in its title.
    [Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 9, 10, 15; Dec. Dig. § 7.*]

Action by the Town of Smithtown against the St. James Oyster Company and another, to enjoin taking away or interfering with oysters in St. James Bay, or Stony Brook Harbor, Smithtown, and for damages. Judgment for plaintiff.

Charles M. Stafford, of Brooklyn, for plaintiff.

Livingston Smith, of St. James, and Alexander G. Blue, of Patchogue, for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

·PUTNAM, J. The St. James Oyster Company was· incorporated under the laws of New York in May, 1910, the incorporators being Mr. John S. Seaman, of ,St. James, and Messrs. William H. Smith and Edward L. Manville, both of New Haven, Conn. The town of Smithtown had long exercised control over the navigable waters of St. James Bay or Stony Brook Harbor. In March, 1910, Mr. Seaman made an application to the town board of Smithtown on behalf of the St. James Oyster Company to plant oysters upon land in waters in this harbor, which application was refused. Indeed, it had been the town policy for over 30 years to maintain the shell fisheries within town waters for the common use of the inhabitants, and not to grant exclusive rights for planting oysters. However, the St. James Oyster Company, after refusal of its application to the town, and without any permission from the town or its officials, planted seed oysters in Porpoise Channel in Stony Brook Harbor. This planting began in May, 1910, and continued until later in the summer. At various dates in November, 1912, the defendants operated a gasoline boat, with an oyster dredge weighing over 150 pounds, upon the oyster beds in Stony Brook Harbor. By these operations defendants removed and took to Connecticut over 1,000 bushels of oysters, and also took up a large quantity of shells and other substances, upon which the germs or set of the oysters are attached; such shells being necessary in the order of natural growth for producing oysters. These acts tended seriously to damage these oyster beds, so that a continuance of such dredging would bring about their destruction. Plaintiff brings this suit for an injunction. It appears that these trespasses were committed without the consent of plaintiff, and without authority of law, and that, although plaintiff has requested the defendants to withdraw their dredging from the town waters, defendants have refused to do so, and assert and threaten to go on dredging and taking away oysters.

[1] The complaint alleged that defendants' acts would cause irreparable damage, but it did not formally aver that the defendants were irresponsible. This, however, was not essential. Where the acts interfere with rights and privileges over natural objects, like standing timber, water rights, and other similar interests not ordinarily marketable, the injured party is entitled to an injunction, even if the aggressor is of ample financial responsibility. This precise principle has been applied to the protection of oyster beds, both natural and artificial, and injunctions granted to restrain depredations thereon. Jones v. Oemler, 110 Ga. 202, 35 S. E. 375; White v. Petty, 57 Conn. 576, 18 Atl. 253; Powell v. Wilson, 85 Md. 347, 37 Atl. 216.· Thus, where the question of title was in dispute, the injury threatened from taking up oysters was held to be of such a kind that defendants would be enjoined, even during the pendency of the proceedings at law. Britton, Adm'r, v. Hill, 27 N. J. Eq. 389. When, therefore, on this trial it appeared that the St. James Oyster Company had no property except its claim to these oysters, and. that its plant was hired from other persons, plaintiff's motion to amend and charge that the defendants were irresponsible was denied, as this formal averment was not needful, because the wrong. threatened, and not the

inability to answer for damages, enabled plaintiff to seek this remedy. It abundantly appears by testimony and records going back to colonial times that the town exercised control over clams, and later over oysters, in all the town waters, and appointed officials to regulate the fisheries and provided fees called "toleration fees" for permits to be granted to other persons to take clams or shell fish from the town waters. At a town meeting in 1790 it was—

"voted that all persons coming from Connecticut and ketching (sic) clams in Stony Brook Harbor shall pay one shilling per bushel and the same in Smithtown Harbor."

Like provisions for the prices to be exacted from outsiders follow in subsequent town meetings, and in 1813 officials called "clam commissioners" were appointed. In 1818:

"Voted that no foreigner shall take shell fish from the harbors or the waters of this town without paying to the commissioners 50 cents per bushel as toleration for the same, the commissioners to have one-half the toleration."

This was in substance the same local provisions as were enforced by the town of Oyster Bay to guard its home shell fish beds. Rogers v. Jones, 1 Wend. (N. Y.) 237, 19 Am. Dec. 493.

After various permits granted to persons to plant oysters in certain localities in Stony Brook Harbor, it was voted in 1872 that the people of the town have the exclusive right to clams and oysters, but that a charge of 25 cents a barrel be made for such as are taken out of the town. These town meeting records show assertions of jurisdiction, not only over the fisheries, but as to the rights to construct wharves, to build and maintain bridges, and as to sand about the beaches, which between 1870 and 1880 had become a source of revenue. After 1890, bay constables were elected or were appointed. These rights, exercised over the land under tide water, appear to have been questioned upon the ground that the lands outside of and beyond low-water mark, even in bays and harbors, are under the jurisdiction of the state. Accordingly, a cession was made of state lands under water in Huntington Bay to the town of Huntington by chapter 279 of the Laws of 1888. On June 6, 1895, the state granted to the plaintiff the land under tidewater of the Nissequogue river, as also that of Smithtown or Stony Brook Harbor, which—

"are hereby granted, conveyed and released to the said town of Smithtown for the promotion of oyster and shell fish culture, but nothing herein contained shall be construed to alter or abridge the right of the commissioners of the land office to make grants of land under water within said town in the same manner and to the same extent as if this act had not been passed." Laws of 1895, c. 952.

Notwithstanding this reservation, such a grant effectually ceded all the title of the state to the town, at least as far as it was necessary for oyster cultivation. Lowndes v. Huntington, 153 U. S. 1, 14 Sup. Ct. 758, 38 L. Ed. 615. However, the town board by letter filed with the Secretary of State, dated May 18, 1896, made an independent claim to the lands under these town waters, asserting its long and uninterrupted user by granting leases and collecting toleration fees and other acts of continued occupation and control.

Against this array of town records and the evidence of tradition from testimony of old residents, the defendants set up title by an alleged lease from C. Melville Smith, one of the heirs of Richard Smith, the individual patentee. A careful examination of the title of the patentee, both as derived from the Indian deeds as well as the patents from Governors Nichols and Andros, shows that Stony Brook Harbor was not embraced in these deeds or patents, which do not include bays, harbors, or tidewaters. Sage v. Mayor, etc., 154 N. Y. 61, 69, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592. The policy of the crown in not granting tidal waters to private individuals is well known. Although the English law did not recognize the broad general public rights over shores and tidal waters allowed by the Roman law, the colonial policy was not to grant rights to a private individual, but only to municipalities or to proprietors in trust for the inhabitants. Martin v. Lessee of Waddell, 16 Pet. (U. S.) 367, 10 L. Ed. 997. For a century and a half these town meetings were largely made up of descendants of Mr. Richard Smith, the patentee. They acquiesced in these assertions of the town rights over the fisheries of this harbor, and many acted as officials for the enforcement of such regulations. The town ownership and control of the shell fish beds in Stony Brook Harbor was never disputed by any such descendants as far back as the memory of living witnesses extends. Hence it must be inferred that the management, regulation, and control in 1910, and always prior thereto, had been conceded to be in the town of Smithtown, and not in the heirs of the patentee.

[2] Prior to defendants' acts of dredging in the oyster beds in Smithtown Harbor, the plaintiff was in peaceable possession thereof for the benefit of all the town's inhabitants, and which possession, use, and control of these oyster beds have been continuous, exclusive, open, and notorious. Such long user, showing control over its oyster fisheries, gives plaintiff the benefit of any presumption which may be used to supply defects, if not a title by prescription. Trustees of Brookhaven v. Strong, 60 N. Y. 56, 71.

It was, however, claimed by the defendants that before planting the oysters the bottom was examined, and that there were no natural beds where Mr. Seaman planted these oysters in the summer and fall of 1910. The method of examination of the bottom of this tideway is far from conclusive in view of the other evidence. It cannot be inferred that, while natural oysters had been regularly grown and gathered here for a long series of years, the defendants succeeded in finding in this very spot in the rapid tidal waters of Porpoise Channel a large district quite bare of shell fish, and upon which the defendants planted seed oysters. The probabilities as well as the testimony are otherwise. Planting means in oystermen's terms depositing with intent that the oysters shall remain until they increase in size and are fattened. The object is therefore to make use of the soil and the water above it for the improvement and growth of that which is planted. McCready v. Virginia, 94 U. S. 391, 397, 24 L. Ed. 248.

Our law forbids any one not an actual inhabitant and resident of this state from planting oysters within the state waters without the

owner's consent. Penal Law (Consol. Laws 1909, c. 40) § 1550. The defendants admit that they came here without authority of law. The dredge they used was also a violation of Penal Law, § 1551. Defendants must therefore be held to be intruding trespassers in planting these oysters in 1910; also their operations of dredging in 1912 were a wrongful destruction of valuable natural beds, the property of the inhabitants of Smithtown.

Plaintiff is therefore entitled to judgment for the value of 1,002 bushels of oysters taken, being, at $1.50 a bushel, $1,503; also to an injunction enjoining and restraining the defendants, their agents and servants, from taking away, interfering with, or disturbing the oysters or other shell fish in and under the waters of Stony Brook Harbor, with costs.