**UNITED STATES of America, Appellant and Cross-Appellee,**

v.

**SMOOT SAND and GRAVEL CORPORATION, Appellee and Cross-Appellant.**

No. 7387.

United States Court of Appeals Fourth Circuit.

Argued April 4, 1957.

Reargued Oct. 8, 1957.

Decided Oct. 17, 1957.

S. Billingsley Hill, Attorney, Department of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., Lester S. Parsons, Jr., U. S. Atty., Norfolk, Va., and Roger P. Marquis, Attorney, Department of Justice, Washington, D. C., on brief), for appellant and cross-appellee.

Howard W. Smith, Jr., Alexandria, Va., for appellee and cross-appellant.

Joseph S. Kaufman, Asst. Atty. Gen., of Maryland (C. Ferdinand Sybert, Atty. Gen. of Maryland, on brief), for the Attorney General of Maryland amicus curiae.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOBELOFF, Circuit Judge.

The United States appeals from a judgment entered against it in the District Court for the Eastern District of Virginia in a condemnation proceeding which it instituted to acquire approximately two hundred and fifty acres of land for the Army with a view to establishing thereon a radio transmitter station. The owner cross-appeals.

The tract, belonging to Smoot Sand and Gravel Corporation, is located in Prince William County, Virginia, and is riparian to Occoquan Bay, a tidal estuary of the Potomac River. The question presented is whether the Court erred in permitting the jury, in valuing the condemned land, to include as appurtenant thereto the rights of the owner in such sand and gravel deposits as extended uninterruptedly from the mean low water mark into the abutting tidal waters of the Bay.

The Smoot Corporation contended that a Virginia statute [1] gave it, as owner of

---

1. Sections 62–1 through 62–3 and 62–178 through 62–181 of the Virginia Code (1950 Ed.) provide as follows:

"62–1. *Ungranted beds of bays, rivers, creeks and shores of the sea to remain in common.*—All the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of this Commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the Commonwealth of Virginia, and may be used as a common by all the people of the State for the purpose of fishing and fowling, and of taking and catching oysters and other shellfish, subject to the provisions of Title 28 [rules for taking and catching fish, oysters and shellfish], and any future laws that may be passed by the General Assembly. And no grant shall hereafter be issued by the State Librarian to pass any estate or interest of the Commonwealth in any natural oyster bed, rock, or shoal, whether the bed, rock or shoal shall ebb bare or not. (Code 1919, § 3573.)"

"62–2. *Rights of owners to extend to low watermark.*—Subject to the provisions of the preceding section, the limits or bounds of the several tracts of land lying on such bays, rivers, creeks and shores, and the rights and privileges of the owners of such lands, shall extend to low watermark, but no farther, unless where a creek or river, or some part thereof, is comprised within the limits of a lawful survey. (Code 1919, § 3574.)"

"62–3. *Leasing of the beds of certain waters.*—The Attorney General with the consent and approval of the Governor, shall have authority to lease the beds of such of the waters within the jurisdiction of the State, without the Baylor survey, as they deem proper, for periods not exceeding five years, with the right to renew the same for additional periods not exceeding five years each to such persons and upon such terms as they deem expedient and proper, which leases shall authorize the lessees to prospect for and take from the bottoms covered thereby, oil, gas, and such other minerals and mineral substances as are therein specified; provided, that no such lease shall in any way affect or interfere with the rights vouchsafed to the people of the State concerning fishing, fowling, and the catching and taking of oysters and other shellfish, in and from the bottoms so leased, and the waters covering the same. All leases made under the authority granted by this section, shall be executed in the name and for and on behalf of the State, by the Attorney General, and shall be countersigned by the Governor. The Commissioner of Fisheries and the Attor-

the riparian land, the right to dig and sell sand and gravel from deposits which extended uninterruptedly into the Bay, and that for the loss of this right through condemnation, it was entitled to be compensated. The United States interpreted the statute differently, contending that it conferred no rights upon the landowner for which it was entitled to compensation and that the statute was directed to other purposes. In point of fact, the Government contended that there was no deposit extending uninterruptedly from the fast land and that the intermittent traces shown from the borings had no commercial value.

In a pretrial order, the District Judge upheld Smoot's contention as to the meaning and legal effect of the statute. He ruled that the landowner was entitled to be compensated for the fair value of the rights conferred upon it by the statute in respect to any sand and gravel deposit that may extend uninterruptedly from the fast land into the Bay.

At the trial, the Court submitted special issues to the jury. These are, first, what is the fair market value of the fast land, irrespective of any rights conferred by the statute; second, whether or not any sand deposits extended from the main land into the tidal waters; and third, if the second question is answered in the affirmative, what is the fair market value of the tract taken as a whole, including the value of the rights arising under the statute. The jury was instructed to take into consideration that the right or privilege in regard to the underwater deposits, if any, was subject to the paramount powers of the State and Federal Governments. They

ney General shall make reports to the General Assembly of all such leases so made, such reports to be made on or before the first day of December preceding the convening of each regular session thereof. (1946, p. 948; Michie Suppl.1946, § 3573a.)"

"62–178. *Dredging of sand or gravel prohibited.*—It shall be unlawful for any person or corporation to dredge, dig, or otherwise remove and carry away any part of any deposit of sand or gravel, or mixture of sand and gravel from any part of the fast land, or beach or bluff, abutting upon any of the rivers, streams or other waters within the jurisdiction of the Commonwealth, or from any part of the bed of such rivers, streams or other waters between high and low water marks.

"In case any such deposit extends uninterruptedly from low water mark out into the bed of such waters, it shall, except as hereinafter provided, be unlawful to dig and carry away any part of such extended deposit lying between such low water mark and the middle line of such waters. (1920, p. 284; Michie Code 1942, § 4441(1).)"

"62–179. *Violation a misdemeanor.*— Any person or corporation violating the provisions of this chapter shall be guilty of a misdemeanor, and, upon conviction, shall be subject to a fine of not exceeding three hundred dollars, or imprisonment not exceeding six months, or both, in the discretion of the court. (1920, p. 284; Michie Code 1942, § 4441(1).)"

"62–180. *Injunction and damages.*— Any owner of any such fast land or beach, bluff, or bed of stream, between high and low water mark on which any such deposit exists or from which it extends towards the middle line of the water, as aforesaid, may, by appropriate proceedings brought by such owner, have a perpetual injunction against any person or corporation removing and carrying away or attempting to remove and carry away any such deposit or extension thereof, and may, in such proceeding, or by separate action, recover against such violation of this act damages in treble the value of the material removed. (1920, p. 284; Michie Code 1942, § 4441(1).)"

"62–181. *Exemptions from chapter.*— The prohibitions of this chapter shall not apply to any owner of any fast land, bluff, beach or bed of stream, upon or in front of which such deposits may lie, nor to any person or corporation acting under written permission from, or contract with such owner, nor to any person or corporation, acting under the authority of the United States, necessarily removing such deposit in the lawful improvement or regulation of navigation of any waters subject to the authority of the United States.

"None of the provisions of this chapter shall be deemed to interfere in any manner with the provisions of any law of this State relating to taking fish and oysters.

"The provisions of this chapter shall not apply to Princess Anne county nor to Pulaski county or New river therein. (1920, p. 284; Michie Code 1942, § 4441 (1).)"

were told to consider, in their answer to the third question, the probability or improbability that the privilege would ever be disturbed by either sovereignty.

The jury returned answers to these questions and valued the land, exclusive of any rights to sand or gravel below the low water mark, at $40,000.00; it answered that there were deposits of sand or gravel which extended from the Smoot land uninterruptedly from the low water mark into the bed of the tidal waters, and it determined that just compensation for the tract condemned, including the owner's rights in such deposits, was $90,000.00. Judgment was entered for $56,200.00, with interest, that figure being the difference between the jury's valuation and the sum of $33,800.00 deposited by the United States into the registry of the Court as estimated compensation when the declaration of taking was filed.

■■■ We turn to the law of Virginia to ascertain the rights of a riparian proprietor, for it depends upon the laws of each state how far the prerogative of the state to lands under water shall extend. Hardin v. Jordan, 1891, 140 U.S. 371, 11 S.Ct. 838, 35 L.Ed. 428. It cannot be doubted that in Virginia the title of the landowner runs only to the low water mark, and that title to the soil under tidal waters is in the State. This is in accordance with the recognized common law rule and is confirmed by declaratory statutes. Virginia Code, 1950 Ed., Secs. 62–1 and 62–2; Taylor v. Commonwealth of Virginia, 1904, 102 Va. 759, 47 S.E. 875; Newport News Shipbuilding and Dry Dock Co. v. Jones, 1906, 105 Va. 503, 54 S.E. 314, 6 L.R.A.,N.S., 247; Meredith v. Triple Island Gunning Club, 1912, 113 Va. 80, 73 S.E. 721, 38 L.R.A.,N.S., 286. As the Government recognizes, the riparian owner always had certain rights in the adjacent submerged land, such as to enjoy the natural advantage of his location; to use a right of way to and from the navigable water; to build a pier or wharf, subject to the regulation of the State; to have the benefit of accretions or alluvium, and to make reasonable use of the water as it flows past his land. It is not necessary to explore in further detail the common law rights of the owner of land adjacent to tidal waters, and it may be said at once that these were never considered to include the right to remove substances from the soil under water. See Taylor v. Commonwealth of Virginia, supra, and Lewis on Eminent Domain (2d Ed.), Sec. 83.

The common law is, however, subject to modification by statute. Without altering the rule as to title to the land under water, the Virginia Code undertakes to regulate the removal of sand and gravel from the beds of rivers, streams, or other waters within the jurisdiction of the commonwealth. It first reaffirms Virginia's property in all the beds of the bays, rivers, creeks, and the shores of the sea, not conveyed by special grant or compact according to law, reserving such beds to the use of the people of the State, subject to any future laws that may be passed by the General Assembly. Sec. 62–1. It then provides that the limits of tracts lying on such waters shall extend to the low water mark. Sec. 62–2. It further provides for leasing of such beds, for limited periods, under conditions, for the removal of oil, gas, and other mineral substances. Sec. 62–3.

In 1920 several new sections of the law were enacted to deal with the subject of sand and gravel. These provisions made it unlawful to dredge or remove sand or gravel from any part of the fast land or beach or bluff abutting on such waters, or from the beds of the waters between the high and low water marks. Where any such deposit extends uninterruptedly from the low water mark out, digging and carrying away any part of such extended deposit between low water mark and the middle line of such waters is made unlawful. Sec. 62–178. Violation is a misdemeanor subject to fine and imprisonment. Sec. 62–179.

The last mentioned provision is prohibitory and carries criminal sanctions, but there follow other sections, highly

pertinent here, that look primarily and specifically to the rights of abutting owners and to the vindication of such rights, if invaded. The owner of the fast land from which a deposit of sand or gravel extends toward the middle line of the water, may obtain a perpetual injunction against anyone's removing such deposit. He may also recover from the violator, as damages, treble the value of the material taken, Sec. 62–180. A final section exempts from the criminal prohibition the landowner or anyone acting with his permission, or under a contract with him, and anyone acting under authority of the United States in the lawful improvement or regulation of navigation. Sec. 62–181.

What is the true meaning of these provisions, taken as a whole, and do they confer rights for the loss of which riparian owners may demand compensation in a condemnation proceeding? It is a rule, firmly established beyond debate, that any purported grant by a sovereign is to be strictly construed, Shively v. Bowlby, 1894, 152 U.S. 1, 10, 14 S.Ct. 548, 38 L.Ed. 331; yet it must be construed, not emasculated. There is wisdom in the rule that in examining a grant by the sovereign, if the words can without distortion be understood broadly or narrowly, they are to be taken in the more limited sense; but it would be an abuse of this rule to search for subtleties in an effort to defeat a grant, however phrased, when its meaning is self-evident.

We cannot accept the suggestion of the Government that this is merely a criminal statute to prevent depredation of the shores of the waters of the State by the indiscriminate removal of sand. Nor do we agree that since the law con-

tains an exemption in behalf of dredging by the United States to improve navigation, the exemption expressed in behalf of the owner is merely to dredge when necessary to the enjoyment of pre-existing rights, such as the construction of a pier or wharf, or to make a channel to navigable waters. The exemption of the United States is merely a recognition of its paramount rights in the navigable waters. This exemption in no other way qualifies the grant of dredging privileges to the abutting owner.

The creation in a riparian owner of a right to damages against anyone removing sand or gravel, and supplying a statutory measure of damages according to the value of the material removed, plainly implies a right in the landowner for the invasion or loss of which he is to be indemnified. It is notable that the damages are measured by the value of the sand or gravel removed, and not by the extent of the injury to any common law right to construct a pier or wharf. This award of damages is in addition to the criminal penalty which the State imposes to maintain public order. Even a narrow construction of the statute cannot overlook what seems to us obvious, namely, that the riparian owner is awarded the exclusive right to dredge, and in case of its infringement by anyone, he is entitled to be reimbursed for the loss which he thus sustains. It cannot be disputed that when one is assigned the right, pending its revocation, to use or consume something to the exclusion of all others, and to receive compensation from anyone who ventures to exercise the privilege without his authority, he has a species of property, regardless of what theory of property we may adopt.[2] Rights in or appur-

---

2. Maryland has a similar statute. Art. 27, sec. 572 (1957 Supplement to Md.Code.) After setting forth the general prohibition against digging sand and gravel from the state-owned beds, the Maryland statute continues, "that it shall be lawful for any riparian owner of lands in the State of Maryland * * * to dig, dredge, take and carry away sand, gravel

or other materials from the bed of said river opposite said lands * * *."

The Virginia statute, constructed somewhat differently, accomplishes the same result in a negative fashion. Section 62–178 contains the general prohibition against such digging, and section 62–179 makes the unlawful digging a crime. Following these, section 62–181 says that,

tenant to land, whether dry or under water, even if they amount to less than fee simple title, are property. Whether the right with which the owner is endowed by this statute is called a revocable though unrevoked "license," or a "profit a prendre,"[3] is immaterial. The label does not matter; the substance cannot be taken away by the United States even for a public use without the owner being made whole. 1 Minor on Real Property (2d Ed., Ribble) 70 and 132.

 The legal power to confer such benefit upon the abutting landowner rests with the State of Virginia. Questions as to the wisdom and the social utility of the action of its lawmakers are not for us; our sole function is fairly to ascertain and give effect to their action. If, as the Government asserts, the State has needlessly enriched riparian owners at its own expense, we cannot on this account disregard Virginia's statute or ignore Federal constitutional guarantees.

 This does not mean that the State has divested itself of title to the land beyond the low water mark. It has, however, conferred certain rights while retaining title, and the riparian owner may not by condemnation be divested of these rights, which are valuable, without just compensation.[4] This is the clear command of the Fifth Amendment to the Constitution of the United States.

## The Cross-Appeal

As not infrequently happens in condemnation cases, wide disparities developed between the condemning authority and the condemnee as to the value of the property taken. The Government's witnesses, valuing the fast land in disregard of any right to remove sand and gravel from the Bay—maintaining that the submarine deposit opposite the Smoot land had no value—said that the highest utility of the tract was for farming purposes, and appraised it at $25,000.00 to $31,250.00. On the other hand, Smoot's witnesses, computing the estimated cubic yardage at commercial prices of sand and gravel, declared that the fast land alone was worth $750,000.00 to $890,-000.00, and put the value of the offshore deposit at $668,000.00. The jury, as also often happens, did not agree with either side in its valuation of the property as a whole or, apparently, in the appraisal of component factors in the valuation.

In arguing its appeal, the Government points to the inclusion of $50,000.00 in the total verdict of $90,000.00 to cover the offshore rights, as an indication that these rights have been overvalued. It seeks reversal, but no new trial. It wishes the case remanded with directions

---

"the prohibitions of this chapter shall not apply to any owner of fast land, bluff, beach or bed of stream upon or in front of which such deposits may lie * * *."

In addition, the Virginia statute, unlike the Maryland Act, implements the abutting owner's rights by specifically giving him the right to an injunction and treble damages from others who, without his permission, dig from the bed in front of his land. Section 62–180.

Yet, with less statutory material from which to ascertain the grant of a legislative privilege, the Maryland Court of Appeals said:

"The right conferred by the [Maryland] statute in question is in the nature of a license or privilege to the riparian owner, and those with whom he has a contract in writing, which may be revoked at any time by the Legislature." Smoot Sand and Gravel Corp. v. Columbia G & D Corp., 146 Md. 384, 126 A. 91, 93, 1924.

3. Maryland has not seen fit to construe its legislative privilege as a "profit a prendre." It has been held that the assignability of the privilege is limited to the duration of the assignor's title to the fee, and that it is not an independent incorporeal estate in the land. Smoot Sand and Gravel Corp. v. Columbia G & D Corp., ibid.

4. In response to a letter of the Attorney General of the United States, inviting the Attorney General of Virginia to participate as *amicus curiae*, the latter declined, saying: "I am constrained to believe that Judge Bryan's construction of the Virginia statutes—to confer upon riparian owners a right in the nature of a license or *profit a prendre*, revocable by the Virginia Legislature—is a supportable interpretation. * * *"

to enter judgment limited to $40,000.00, in accordance with the verdict as to the fast land. Smoot's cross-appeal, on the other hand, also claims an inconsistency in the verdict, but draws different conclusions therefrom. It stresses that the jury allowed less for the fast land than for the rights in the submerged land, although according to Smoot's claim, the former had larger deposits of sand and gravel than the latter. It points out that the Government's testimony also ascribed greater value to the fast land ($25,000.00 to $31,250.00) than to the offshore rights, which the Government contended were without actual value even if legally such rights could be included in a verdict. Therefore, Smoot reasons, the verdict was erroneous, contrary to the Judge's charge, and without supporting evidence. It insists that the District Judge should have granted its motion for a new trial under Rule 59 of the Rules of Civil Procedure, 28 U.S.C.A. While conceding that refusal of a motion for a new trial is not reviewable on appeal save in exceptional circumstances, it claims that the above analysis of the testimony and the verdict presents a case requiring reversal and a new trial.

For the reasons already stated, we think the Government is not entitled to have the case remanded for the entry of a judgment limited to $40,000.00 and disallowing all compensation for underwater sand and gravel rights. Smoot's cross-appeal must also be denied. Smoot points to no evidence offered by it that was excluded, and to none that was improperly received at the instance of the Government. It made no objection to the charge. Essentially, the basis of the cross-appeal is that the jury rejected the owner's valuations and declined to adopt its theoretical computation. That the jury's verdict is not consistent with either party's theory of valuation is no ground for a retrial. The jury heard the experts presented by the parties and could accept or reject any part of their testimony. It was not bound by the estimates as to the size of sand and gravel deposits, and it was certainly not re-

quired to make the witnesses' calculations of the value of these deposits the only basis in arriving at the fair market value of the property taken. Having seen the property, it had wide latitude for the application of its own judgment. Its verdict is within the range of the credited testimony, which should not be reweighed on appeal. Stephens v. U. S., 5 Cir., 1956, 235 F.2d 467. The circumstances certainly indicate no abuse of the Court's discretion in refusing the motion for a new trial. Trout v. Cassco, 4 Cir., 1951, 191 F.2d 1022.

Affirmed.